Good morning. May it please the Court, Brendan Cummings on behalf of Plaintiff's Appellant's Center for Biological Diversity et al. In this appeal, the Court must decide whether a U.S. federal agency's decision to fund, to commit nearly $5 billion to two massive fossil fuel projects in the Great Barrier Reef World Heritage Area without complying with applicable U.S. environmental law is ultimately reviewable by the courts. It is at issue, the Endangered Species Act and the Natural Historic Preservation Act, both explicitly apply to projects funded in whole or in part by federal agencies. It is undisputed that these projects impact ESA-listed species and the World Heritage Area, and for purposes of standing, harm to plaintiffs and their members is uncontested. So of the three prongs of standing—injury, causation, redressability—the first is not disputed. It is also undisputed that this case involved procedural injuries. And the Ninth Circuit has repeatedly affirmed that procedural injuries are different. For example, in 2015, in the case CBD v. Fish and Wildlife Service, the Court stated, quote, a showing of procedural injury lessens a plaintiff's burden on the last two prongs of Article III standing inquiry—causation and redressability. Thus, because CBD is asserting a procedural injury, it must show only that it has a procedural right that, if exercised, could protect its concrete interests. The Court goes on to say, plaintiffs alleging procedural injury can often establish redressability with little difficulty because they need to show only that the relief requested, that the agency followed the correct procedures, may influence the agency's ultimate decision. It seems here we have a unique situation for us in the Ninth Circuit, in that we have procedural violations that are being alleged here, but we have third parties. Yes. And so help us understand what's your best argument on how to proceed when you have procedural violations and this relaxed standard, but third parties, where the Supreme Court in Lujan has given us some guidance that that's a much more substantially harder burden to prove by you. And so why don't you talk to us about that? Okay. First off, CBD Fish and Wildlife Service itself was a third-party case. In that case, the action consulted over or challenged was a memorandum of understanding with non-federal actors over water pumping that would harm and endangered fish. The Court found that those injuries—any threat, quote, any threat to the fish's survival is caused exclusively by those third parties, yet it's still found standing. Is there more agency control in that case, however? Not in that case particularly, because the agency—it was an issue of water pumping by senior water right holders who were non-federal, and the federal agency, which had interest in protecting the fish, but no direct regulatory authority, entered into this MOU in an attempt to head off a future crisis. So there it was a clear third-party case. It's a third-party case, but is this the water case you're talking about? Yes. It seems, though, that the contractor there—I mean, this is really interesting to me, because they were entering into contracts, right? And you have a contract here, I guess, or a loan, but, you know— A loan is a contract, yes. Okay. And I think it was highlighted that renegotiation could be a benefit of that loan, and I think you kind of sort of put forward that argument here, but is a financing—just that's all we have here in this case. Is that enough to put that on par with that situation in the water case? Yes. And before going direct to that, I want to highlight the third-party issue from the from a couple other sources, because the Ninth Circuit has teased this out pretty explicitly in the public citizens case, where there it involved a third party, the president, who was not before the court, who had to act before there was harm. And the court went through all the language in Lujan and other cases about third parties not before the court, and it acknowledged that the government's position had a certain appeal, but ultimately it found standing. And I quote from this case, Nevertheless, we find dispositive the lower threshold for causation in procedural injury cases, which often involve third parties whose independent actions are necessary for constitutional injury to occur. So the standard in this circuit doesn't direct—the third-party factor is essentially irrelevant. What case are you talking about right now? Public citizen. And there was a similar thing in a different water case, NRDC v. Jewell, which is an en banc decision. Counsel, Judge Gould, if I could just interject, how could we say Ninth Circuit precedent makes the third-party factor irrelevant when the Supreme Court, its Lujan decision, expressly said it was relevant? Two things. Lujan itself, if you look at footnote 7, which carves out the procedural standard inquiry, there's one sentence of it that's quoted in all the cases about a person living close to where a federally licensed project would occur need not show all the standard imminence and harm because they had no indication that it would actually occur. That's the court then says in the very next sentence, in a parenthetical, that is why we do not rely in the present case upon the government's argument that even if other agencies were obliged to consult with the secretary, they might not have followed his advice. Lujan itself, while it sets up the whole standard of standing that courts have built upon in the past 35 years, it ultimately says it itself was a procedural injury case decided in that case because plaintiffs did not demonstrate standing. And subsequent to Lujan, Massachusetts v. EPA, I think, is, in many ways, the most important case, because that arose out of an appeal of D.C. Circuit decision, relying on D.C. Circuit standing law, which is more constrained than the Ninth Circuit. And the Court reversed and found standing using this some-possibility test, which is very similar to the Ninth Circuit, could have an impact test. And ---- Sotomayor, but what about Chesapeake? I mean, Chesapeake, the D.C. Circuit ruled in that case, basically, when there's a third party, at least my understanding, it heightened the ---- when there's a third party, it raised it back to likely instead of could in terms of what the standard should be when evaluating the injury. Yeah. Chesapeake is a district court opinion out of the D.C. Circuit that I believe would not apply in the Ninth Circuit. You know, as this Court stated in ---- I guess I'm wondering, should we follow Chesapeake? Or why not? Why not? Well, as this Court said in Citizens for Better Forestry, quote, with all due respect for our sister circuit, we are bound to follow the law of the Ninth Circuit. That's what's binding here. I understand that. I'm just saying we have a unique situation here. I mean, what's your ---- what you say is our best Ninth Circuit authority? And we don't have a case quite like this, do we? Not specifically on funding, but what we do have in the definition of action under the Endangered Species Act, in the definition of undertaking under the NHPA, funding in whole or in part renders it a Federal action or undertaking subject to the NHPA's processes that we are challenging. And so that very act makes it a Federal action, a process to which we have a right. And as this Court ---- Counsel, Judge Gould, I agree with that theoretical point. But as a practical matter, please give me your view to explain why, if the funding here from Ex-Im Bank was going to be about 10 percent of the total funding, why we should expect that these developers with, you know, with all the other efforts they'd made and as far as they'd gone would not have found a way to get other funding. First off, the question of whether it's 10 percent or 30 percent, we believe it's 30 percent because these projects had both an upstream and downstream component. The government documents clearly indicate they were only funding the downstream component, which is the export facility and the overseas shipping. Interestingly, in the argument over the reach of the ESA to their high-seas activities, the government very clearly argued it's only the downstream component, only the facility itself you should look at. In their argument over the influence they had on the project, they say, let's look at the whole multi, multi, multibillion-dollar thing where we only were 10 percent of it. They were 30 percent. But even if that's the case, I think the Court in Wild Earth Guardians in 2015 dealt with a similar issue where defendants argued there was no standing because if the Federal action were taken away, the state would step in and fill the void, that independent third party would fill the void. And the Court said, the conclusion that plaintiff's injury is redressable is bolstered by the fact that any independent predator damage management activities in Nevada are hypothetical rather than actual. The notion that Nevada would replace everything APHIS currently does is therefore speculative at best. Such speculation does not defeat standing. At the time these bank loans were approved, and this is covered in our opening brief on page 41, the loan application stated the need for the projects, that there was, quote, lack of capacity in capital markets, that the projects had, quote, significant debt financing need, and that the global financial crisis made funding difficult. But all we have to show is that it could have influenced it. We don't have to show that if Ex-Im Bank had consulted that these projects and had decided to not fund the projects, the projects wouldn't have occurred. It's a lower burden, but it's still not a free pass. You still have to have something in the record that shows us that it could have happened. Exactly. The district court said all of this is conjectural. And the converse of that is there's nothing in the record that tells me it could happen. So what is in the record that tells us it could happen? Well, we cited to various parts in the record where Ex-Im Bank, through its own environmental policies, did attach certain requirements to the funding. There were commitments for environmental monitoring and mitigation that would extend throughout the life of the project. Didn't they just accept what Australia had done? What is it that they did that was more stringent than what Australia had already done? Well, it's unclear because the actual contracts have been wholly redacted and not made available in the record. But what they stated in the record is that their negotiations have been very productive and they've explained their environmental needs to the loan applicants and ultimately they signed contracts that Ex-Im Bank claimed met their environmental policies. We obviously argue that those were not sufficient. But, you know, we are talking about $3 billion of financing, the second largest loan in the bank's history to one of these projects. That gives them substantial influence to add some environmental terms. But does it, when it's this big of a project and it's 10, 25, let's say even 30 percent of the financing? I mean, and that's being generous, I think, the 30 percent. I mean, sounds like there's other investors, there's other project proponents here and participants and arguments being made that this could go forward without or, I mean, that's the whole question. How much does this bank loan or this bank, can they influence the project from going forward? Right. And our read of Supreme Court law, Ninth Circuit law, is that there has to be some possibility, that's the language in Mass EPA, or it could. As the en banc court said, as long as contract revision could add additional benefits that reduce harms, that's sufficient for standing. I guess just real quick before your total time elapses here, I mean, what are the sources for the bank's obligation? You make a reference that the bank had some obligation. Is there an enabling statute posing a duty to mitigate environmental harm or is it only required to consider environmental harm? My read of their enabling statute is it allows them to consider environmental harm and allows them to make decisions based upon environmental harm and then they have a guidance document for their loans that tells them when and how they can add conditions to minimize environmental harm. But the ultimate obligation under the claims we've brought in this case are those contained in the Endangered Species Act and the National Historic Preservation Act. Because this is an undertaking that affects a world heritage area, they had a duty to avoid and process. And if they comply with that process, some of those harms may be mitigated. Counsel, I might be taking you over your time, but I'll ask Judge Murgata, please give you a little extra time on rebuttal. But my question is this. Why does the Ex-Im Bank make these kinds of loans? I assume it's to encourage exports from the U.S. for some part of the project. And if that's right, then is it to be expected that if the Ex-Im Bank withdrew and wouldn't make the loans that some other country's bank would step in and do the same thing? Yes. My understanding of the purpose of the bank is that it's to foster the use of U.S. things. So for an LNG facility, it's maybe a turbine manufactured in Wisconsin or something will be used in building of it. And there is some competition among various export banks, but there are also the EU, its export banks also have environmental provisions. So we're not stating that if for some reason Ex-Im Bank stepped away entirely, that all environmental review would go away. And again, this is similar to the Guardian's case where we can speculate that if they pulled out, who might come in and step in, but that shouldn't defeat standing. I'll give you a little bit of time to respond. Good morning, Your Honors. Eric Grant, U.S. Department of Justice for the Federal Defendants. I'll turn in a minute to the very interesting questions about this so-called relaxed standard for addressability. But first, I'd like to suggest that this case is moot. As we documented in the Rule 28J letter that we filed last week, both of these loans are fully funded. That is all of the money that the Ex-Im Bank ever paid out has already been paid out. And in fact, one of these two loans, the QCLNG project, was fully repaid back to the bank three months ago. So we're faced with a situation now where the bank no longer has any power or influence to impose the kinds of conditions that the plaintiff's Is that true? I mean, I guess these contracts can't be renegotiated, the loans can't be renegotiated or refinanced? No, Your Honor. We've paid out the money. The negotiations were done and the contracts were executed literally five years ago, both loans in 2012. And so the bank doesn't have any kind of relationship with the project proponents here? The only relationship is we want our money back and we're due to get it back for one of these projects by the year 2029. But for the second project, we have no relationship whatsoever because the loan has already been paid back on July 17th of this year. When was it? In July 17th? July 17th. Because I thought the plaintiffs had submitted evidence that the loans had not been fully repaid. Is that? I want to be clear, Your Honor. One of the two loans has been repaid, the QCLNG project. The second loan has fully been funded, been paid out, been paid from the bank to the borrower. And did that happen in July of this year? No, Your Honor. That happened as we put in our declaration. It was fully funded in March, March 30th of this year. We had predicted in a filing last December that it would be in May. It happened a couple months early in March, March 30th of 2017. So really the bank has no more influence over these projects, no ability to say, if you don't do what we want you to do, we're going to hold back some money. Is that a moot question or is that a third-party proof problem that Lujan identified with respect to standing? Well, I think it's a mootness issue, Your Honor, because it's developed during the course of this litigation. And so our position is that if there ever were standing, and I'll get to those issues in a second, it's gone now. And although plaintiffs have suggested that this is one of those cases that are capable of repetition but evades review, that's not the situation here. There was, for one loan, fully three years between the time the loan was authorized and the time the funds were paid out. For the other loan, it was fully five years between those times. So those are not the very short time periods that this Court's have held qualify for the very narrow exception to the mootness doctrine. And of course, even in those kinds of situations, plaintiffs have traditional tools like motions for preliminary injunction or motions for injunction pending appeal. So our submission is this case is moot and the district court's judgment should be affirmed on that basis. But our main point, of course, is that the plaintiffs never had standing because they never satisfied the redressability requirement. And what's, in your view, the best or the most proper way to frame the redressability here under the particular facts of this case, and I guess considering the relaxed standard and the role, plus the role of third parties? Well, first of all, Your Honor, I'd like to address that standard and where, in particular, it applies. And there was a colloquy about the D.C. Circuit's law on this point, and we cited a case on page 29 of the answering brief, and this is from the D.C. Circuit itself, called National Parks Conservation Association v. Manson. And the government submits that this provides the correct standard. The Court says, quote, the relaxation of procedural standing requirements would excuse plaintiffs from having to prove the causal relationship regarding the agency action, but its burden regarding the action of the third party would not change. So I think what it's important to distinguish between the two parts here, the government agrees that the standard is relaxed for what the agency would do. Because this is a procedural case, the plaintiffs are allowed to, quite frankly, speculate about what the agency might do and are allowed to put the best spin on what would happen if the agency had gone through the process. So that speculation or spin for the plaintiffs is the agency might have denied these loans, or the agency might have attached additional conditions to these loans. So that's a could-have standard. The agency could have done one or both of those things, and that's what's relaxed. But there's no warrant in the Supreme Court's jurisprudence or in this Court's cases for then relaxing the causal requirement of the third parties. And what traditional standing law redressability requires there is that the plaintiffs prove by nonspeculative evidence that those things that the agency could have done would in fact make a difference in the real world, would in fact alleviate or mitigate the alleged injuries that plaintiffs identify. And of course, the district court, considering all the evidence, ruled, and I want to quote, the projects very likely will continue unimpeded even if plaintiffs obtain the relief sought. And that's on page 12 of volume 1 of the excerpts of record. And the court considered several pieces of evidence submitted by the defendants, one of which was the small percentage of the total project value that these loans constitute, 10.5 percent and 9 percent respectively. But that was only one factor. In addition was the fact that these are multinational corporations, including Royal Dutch Shell, that have tens of billions of dollars of assets and annual revenues and are committed to these projects. Can I ask you, because the plaintiffs referred to some, you know, environmental mitigating requirements that the bank included or may have included in the financing of the loan. And there's very little record evidence on this. And so I'm just trying to figure out, was there a duty by the bank to avoid environmental harm or at least to monitor environmental compliance? And did the bank at one time or even now have any influence over the project proponents in that regard? Your Honor, the duties alleged by the plaintiffs here arise from the Endangered Species Act. And that first duty was a duty to consult with federal wildlife agencies. And the second duty that plaintiffs allege arises from the National Historic Preservation Act. And that's the duty to take into account environmental issues in a project like this. And while the have not reached the merits, we submit that the bank did satisfy both of those requirements. And I would direct the Court to the supplemental excerpts of record. That's Docket Entry 21. Pages 37 through 57 are the very detailed environmental conditions imposed by the Queensland and Australia government. And those include specific provisions for the protection of dugongs, green turtles, and loggerhead turtles. And I'd also refer the Court to supplemental excerpts of record 76 through 91 for the other project. So there were numerous conditions imposed. Is it correct that the bank adopted those conditions and did not suggest further conditions? That is correct, Your Honor. And one of our points is that plaintiffs have never suggested particular additional conditions that would have made a difference without causing the borrowers to refuse the funding and continue the project without export credit agency, without export-import bank funding. And why aren't the financing agreements between the bank and the project proponents in the record? Quite frankly, I don't know, Your Honor. I do know that if it weren't... Who has the burden to produce them? In general, in an administrative record case like this, the defendants do. But whether there was... The defendants, that's you all, right? Correct, Your Honor. But whether there was a problem with that, what I do know is that plaintiffs did not make an objection in the district court or certainly did not procure a ruling one way or another and bring it to this Court's attention if there were a problem. Even if you're obligated, they would have needed to object? I believe so, Your Honor. So I wanted to get back to the very last and I think important point about why these projects would have gone forward even if the bank had done the draconian, taken the draconian step of denying funding. And that was that funding was available from competing export credit agencies. Let's talk about that because I am curious. This was $4.8 billion that the export-import bank gave, and it's, I think, the second largest loan that it's given in its history. Why — how is — how could they not influence the project proponents with that amount of money? It seems rather precedential for the export bank, this project. Your Honor, certainly that's conceivable, but it's a question of fact, like these standing issues are, that's determined on evidence in the record before the district court. And I've tried to — How many other financers were there? I'm not — as I stand here, Your Honor, I'm not aware of the number, but I know that in particular — and this is in the declaration of El Mojande's in the record at volume two, page 36, his detailed declaration based on his 33 years in international banking, that if the export-import bank of the United States did not provide funding, it was likely that China, China's agency or other agencies would step up. And against the — Mr. El Mojande's submission, the plaintiffs really had nothing but speculation They had declarations in which their members said, I believe this would happen or I hope and expect this would happen, but really there wasn't any competing evidence on the other side. And the district court reasonably found, as I quoted before, that it was very likely that these projects would go forward. So, to get back to the relaxed standard, we can assume in plaintiffs' favor that the agencies might have wanted to deny the loans, tried to deny the loans, but as a matter of fact, that decision would have made no difference. So, a court order for the agencies to go through the processes that the plaintiffs allege needed to be done would not have redressed their injuries, which, of course, were limited to the allegedly harmful effects of dredging and shipping off the coast of Queensland, Australia. So again, I think this case is moot. The court should affirm the judgment on that ground. But even if it's not moot, plaintiffs never had standing because of their failure to satisfy the redressability prong, even applying the relaxed standard of redressability, unless the court has further questions. No questions here. Thank you. Thank you, Your Honor. Counsel, may I ask you to respond to the new information that all of the loans have been fully funded? Yes. I mean, do you disagree with that? Or have any basis to? We have no basis to disagree with the money that has been given to the project proponents. And it's undisputed that for one of the projects, money will not be repaid for another dozen years. For the other project, their declaration is a little unclear. It says that  the loan has been fully prepaid. Presumably that's a typo and it should have said repaid, but we didn't. It is what it is. But on mootness, you know, there's multiple exceptions to mootness. And this court has held that, you know, in cases even after construction occurs, because mitigation is possible after the fact, it's not moot. We've cited those in our brief. Neighbors of Cutty Mountain is one, Cantrell v. City of Long Beach. I would note, if you do find this case moot, you know, we believe that the district court summary judgment and motion to dismiss opinion should be vacated so they don't have preclusive effects since unappealable orders shouldn't be preclusive. One thing I did want to point out is on the question of did Ex-Im Bank have any influence beyond what was already in the Australian environmental documents, on page 43 of our opening brief, we cite portions of the administrative record where Ex-Im Bank states that, quote, Australia Pacific has been very cooperative in response to comments in the preparation of environmental mitigation plans, and, quote, compliance gaps identified by the Ex-Im Bank would be addressed in the forthcoming action plan. And there's a similar record cite to the Queensland's Curtis Project. So there was, when Ex-Im Bank did try to influence things, it had some influence. And lastly, on the key issue of third-party standing in a substantive versus a procedural case, I would point the court back to looking at salmon spawning, because there you had both kinds of claims dealt with simultaneously. You had a substantive claim where the court said, you have to meet the likely threshold because the third-party Canada is not before the court, and you can't meet that. But your procedural claim is different. It's a lower standard. And even though that involved the same third-party not before the court, the court simply said, as long as the process could result in the federal agency considering  it, that is the law of this circuit. And that's why we believe that we have standing in this case, and it should proceed to the merits. Thank you very much. Thank you very much. And is it Ridgely Cummings or Mr. Cummings? Do you go by both, Ridgely Cummings? Cummings. Yes, I know. Your last name, though. Cummings. Cummings. Mr. Cummings and Mr. Grant, thank you very much for your excellent arguments here today. We are very grateful for your presentations. It's a challenging case. And that case is now submitted, and that concludes our docket for this morning. We will be in recess. Thank you.
judges: Gould, Murguia, Gritzner